**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

In re:

PAUL A. LONG and
CONNIE J. LONG,

                                       Case No. HG 07-00384

    Debtors.

_____/

## OPINION RE: CENDANT MORTGAGE CORPORATION'S
## NOVEMBER 5, 2010 MOTION - STAY

Cendant Mortgage Corporation ("Cendant") seeks relief from the automatic stay because of

Debtors' post-confirmation defaults on a long term indebtedness secured by their residence.  The

motion is granted.

### BACKGROUND[1]

Debtors confirmed their plan on June 23, 2007.  Among other things, the plan permits

Debtors to retain their home notwithstanding Cendant's mortgage and the debt it secures.  Cendant

had lent $112,000.00 to Debtors in 2001 with the understanding that they would repay the loan over

thirty years.  Consequently, Debtors still owed Cendant in excess of $100,000.00 when they filed for

relief.[2]  Debtors were also well behind in their monthly payments to Cendant.

---

[1]The court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b) and W.D. Mich. LCivR
83.2.  This is also a core proceeding.  28 U.S.C. §§ 157(b)(2)(G).  What follows are the court's
findings of fact and conclusions of law. FED. R. BANKR. P. 7052 and FED. R. CIV. P. 52(a)(1).

[2]Cendant's proof of claim in fact indicates a balance due of $120,872.85.

The exception to Section 1322(b)(2)[3] precluded Debtors[4] from modifying the terms of their loan with Cendant. However, Debtors were able to utilize Section 1322(b)(5) to provide for the cure of their prepetition defaults on the loan. Therefore, their plan provided not only for the Chapter 13 trustee to continue making the monthly installments due Cendant under the note but also for the Chapter 13 trustee to make up the estimated $6,100.00 in arrearages that had accumulated because of the many missed prepetition payments.

Unfortunately, Debtors failed to maintain the contributions needed to fund their plan[5] and, as a consequence, the Chapter 13 trustee was not able to make all of the required payments to Cendant. Although there is a dispute as to the amount of the shortfall, there is no question that Debtors' failure to make their plan payments has caused them to now be in substantial default on the post-confirmation installments that Cendant was to have continued to have received under their plan.[6]

---

[3]11 U.S.C. § 1322(b)(5). Unless otherwise designated, all further references to "Section ____," "Bankruptcy Code," or "Code" shall be to the Bankruptcy Code as currently amended. 11 U.S.C. §§ 101, *et seq.*

[4]The September 7, 2001 mortgage identifies only Connie Long as the borrower and the mortgagor although Paul Long also signed the mortgage. In any event, the court will refer to both of the Longs as the obligors and mortgagors.

[5]Ms. Long lost her job shortly after the plan was confirmed. She also suffered a knee injury that added unanticipated medical expenses to an already tight budget.

[6]According to Debtors, Cendant was to have received under the plan $1,093.62 each month. However, with the exception of February 2011, Cendant had received only partial payments since June of 2010, with some payments being as little as $300.00. Even by Debtors' reckoning, their post-confirmation arrearage is almost $3,000.00. Cendant, though, argues that the arrearage is closer to $4,000.00 because Debtors have inappropriately given themselves credit for a disputed escrow overage of $1,095.00.

2

These new defaults have prompted Cendant to seek relief from the automatic stay. Debtors in turn have opposed the motion. They contend that cause does not exist to lift the stay because of the plan modification that they have proposed.[7] That modification provides for the repayment of the post-confirmation arrearage over the remaining life of the plan. At issue is whether Section 1329, which governs post-confirmation plan amendments, permits Debtors to fend off Cendant's stay motion in this fashion.[8]

The court had scheduled an evidentiary hearing. However, no proofs were taken because the parties had submitted stipulated facts and had satisfactorily addressed the remaining factual disputes at the hearing. Both parties also elected to rely upon their trial briefs in lieu of making lengthy closing arguments. Therefore, the hearing quickly ended with the court taking the matter under advisement.

## DISCUSSION

Debtors rely upon the Sixth Circuit's decision in *In re Nichols*[9] to support their position. As is the case here, the Nichols had fallen behind in their plan payments. But in that instance, the disgruntled creditor, Americredit, had financed Mr. Nichol's truck. Therefore, unlike Debtors, the Nichols were able to take advantage of Section 1322(b)(2) by ignoring the terms of their loan

---

[7]Debtors also contend that the value of their home exceeds what is owed Cendant. However, it is irrelevant whether there is equity in the residence or not because the court finds that there is cause under 11 U.S.C. § 362(d)(1) to grant relief from the stay in any event.

[8]The amendment's feasibility is also contested even with Debtors' lengthening their plan to the maximum sixty months and significantly reducing the dividend to be paid their unsecured creditors. However, like the issue of equity, the court will not address whether Debtors' plan as amended is feasible because Debtors are incapable of proposing their amendment in the first place. *See infra.*

[9]*Americredit Fin. Servs., Inc. v. Nichols (In re Nichols)*, 440 F.3d 850 (6th Cir. 2006).

3

agreement with Americredit and instead proposing the repayment of what they still owed Americredit under completely new terms.[10]  In particular, the Nichols proposed and then had confirmed an arrangement whereby Americredit would be repaid in full as a secured claimant over the five years they had to complete their plan. Unfortunately, the subsequent lapse in plan payments made it impossible for the Chapter 13 trustee to continue making the scheduled distributions to creditors, including the distributions Americredit was to receive.

Americredit eventually sought leave from the automatic stay so that it could repossess the truck that continued to secure its claim.[11]  Americredit argued that cause existed under Section 362(d)(1) to grant such relief because Americredit risked becoming under-collateralized

---

[10]Section 1322(b) permits a Chapter 13 debtor to use his plan to modify the rights of a secured creditor unless that creditor's claim is secured by the debtor's principal residence.

> (b)    Subject to subsections (a) and (c) of this section, the plan may—
>
>          . . .
>
> (2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence, or of holders of unsecured claims, or leave unaffected the rights of holders of any class of claims . . . .

11 U.S.C. § 1322(b).

The only constraints on the debtors are (1) the repayment under the modified terms must be completed within the plan's term, 11 U.S.C. § 1322(d), and (2) the treatment must otherwise comply with the confirmation standards of Section 1325(a)(5).

[11]Although the Nichols were able to alter how they were going to repay Americredit, they could not force these new terms upon Americredit without also permitting it to retain the lien in the truck that had secured the original loan.  11 U.S.C. § 1325(a)(5)(B).

4

notwithstanding the plan amendment the Nichols were proposing.[12] That amendment provided for a sufficient increase in plan payments to ensure that Americredit would still be repaid by the end of the plan. However, the amendment also called for a further delay before the distributions to Americredit would resume and it was that delay that Americredit found objectionable.

Debtors find *Nichols* compelling because of the panel's observation that the equities of the situation, as opposed to just the missed payment itself, should dictate whether cause exists or not under Section 362(d)(1).

> The failure to make payments, standing alone, however, does not usually constitute "cause" to modify or lift the stay, especially where failure to pay resulted from circumstances beyond the debtor's control, such as illness or job loss. When there is still equity in the collateral, courts are not inclined to lift the stay. Generally, before modifying or lifting a stay, a court should first weigh the equities by conducting a fact-specific analysis of the circumstances surrounding the default.

*Id.* at 856 (citations omitted).

Debtors also reference *Nichols'* recognition that a post-confirmation default can be remedied through a plan amendment.

> Modification of the plan is one way a debtor may cure a post-confirmation default, provided that the plan, as modified, conforms with the requirements of §§ 1322(a) and (b) (contents of plan), and § 1325(a) (requirements for confirmation of plan). 11 U.S.C. § 1329(b); *In re Hoggle*, 12 F.3d 1008 (11th Cir. 1994); *In re Davis*, 110 B.R. 834 (Bankr.W.D.Tenn.1989); *but see In re Nicholson*, 70 B.R. 398 (Bankr.D.Colo.1987) (disallowing modification to cure arrearages).

*Id.* at 857.

---

[12]Americredit also argued that the stay should be lifted under Section 362(d)(2) because of Debtors' lack of equity in the truck. However, the panel determined from the record that Americredit had not met its burden with respect to this argument. *Id.* at 855-56.

Indeed, Debtors find particular comfort in the fact that the two of the cases cited in *Nichols* for this proposition – *Hoggle* and *Davis* – involved post-confirmation defaults on home mortgage loans.

However, while *Nichols* may have cited these cases, the fact remains that *Nichols* involved a claim secured by the debtors' truck, as opposed to their home.  Moreover, their plan, as originally confirmed, provided for the repayment of Americredit's secured claim in full within the plan's five-year term.  In contrast, Debtors here will not repay their debt to Cendant until 2031, which is well after the time within which they must complete their plan even if the extension they propose were allowed.  *Cf.* 11 U.S.C. § 1322(d).

These distinctions between *Nichols* and the case at hand are significant because Section 1329 permits only certain types of post-confirmation amendments.  They are:

> (1)     increases or reductions in the amount to be paid a particular class of claims provided for under the plan;

> (2)     extensions or reductions of the time within which to pay a particular class of claims provided for under the plan;

> (3)     adjustments of the amount to be paid a particular claimant in order to account for other payments received by the creditor outside of the plan; and

> (4)     reductions in plan payments to reflect increases in health insurance premiums.

*See* 11 U.S.C. § 1329(a).

In addition, even if a modification is permitted under subsection (a), Section 1329(b)(1) mandates that the modification also comply with Sections 1322(a) and (b) and Section 1325(a) before it may be approved.

What is important to understand about *Nichols* is that the debtors there were no longer dealing with Americredit under the terms of the original agreement that had been reached.  Rather,

6

those debtors had, through the confirmation of their plan, forced upon Americredit an entirely new agreement for the repayment of the remaining balance that they owed. As *Nichols* itself observed, Americredit had in effect been required "to make a new loan in the amount of the value of the collateral rather than repossess it . . . ." *Nichols*, 440 F.3d at 858 (quoting from *Memphis Bank & Trust Co. v. Whitman*, 692 F.2d 427, 429 (6th Cir. 1982)). Therefore, the post-confirmation amendment being proposed in *Nichols* was simply a further adjustment as to how Americredit could be compelled under Chapter 13 to be repaid under this new arrangement. It is commonplace in Chapter 13 cases for a debtor to alter the timing of how his unsecured creditors are to be repaid under the plan. In concept, the debtors in *Nichols* were proposing nothing different with respect to Americredit.

Indeed, Americredit's objection in *Nichols* was not even a Section 1329(a) objection, for Americredit seemed to agree that the debtors could under that subsection further defer the payment of its secured claim. Americredit's objection was instead that the deferral of those payments would jeopardize its collateral position.

> The plan, as modified, does not, according to Americredit, keep pace with the depreciation of the truck and the value of the collateral will fall faster than the creditor receives payment. Therefore, Americredit objected to the modification of the plan on the ground that the delay in payments will allow the value of the truck to fall below the amount owed, making Americredit an "undersecured" creditor that is not retaining its lien rights in the collateral in violation of § 1325.

*Nichols*, 440 F.3d at 860.

But, of course, objections of this type are based upon Section 1329(b), for it is that subsection that requires compliance with Section 1325(a) and, in particular, Section 1325(a)(5). Americredit lost its appeal only because the Sixth Circuit agreed with the bankruptcy court that the feared degradation

7

of its secured position as a consequence of what the debtors were proposing was not so great as to violate either Americredit's Fifth Amendment rights or its rights under Section 1325(a)(5) as then written.

> Americredit's primary argument stems not from the lack of retention of its lien value, *per se*, but from the lack of a steady payment stream over the course of the year. . . . While the equity cushion is not large here, one does exist and we have been provided no evidence that the equity cushion, should it disappear, is so important at this point in the particular financial relationship as to require denial of the plan modification.

*Id.* at 860-61 (emphasis in original).[13]

However, Debtors in this instance cannot simply rearrange the stream of plan payments under Sections 1329(a)(1) and (a)(2) to address their post-confirmation defaults to Cendant.  The reason why is that Debtors here, unlike the debtors in *Nichols*, did not make a "new loan" with their lender as part of the confirmation process.  Indeed, Debtors were incapable of doing so because their indebtedness with Cendant was secured only by their home and the last payment of that obligation was not due until 2031.  *Cf.* 11 U.S.C. §§ 1322(b)(2) and (c)(2).  Consequently, Debtors had no choice but to abide by the terms of the original note and mortgage they had given to Cendant.[14]

---

[13]*Nichols* preceded the effective date of the 2005 amendments and those amendments substantially changed Section 1325(a)(5).  That subsection now requires periodic payments on account of a secured claim to be in equal monthly amounts and that the payments also be sufficient in amount to provide adequate protection to the claimant whenever the collateral is personal property.  *Cf.* 11 U.S.C. § 1325(a)(5)(iii).  Therefore, it is likely that the Sixth Circuit would have come to a different conclusion in *Nichols* had the 2005 amendments applied.

[14]As already discussed, Section 1322(b)(2) empowers a debtor to include within his plans provisions that would allow the debtor to repay a secured creditor's claim under terms different than those originally agreed to.  This is the "new loan" concept referred to in *Nichols*. *See* 440 F.3d at 858.  However, claims secured only by the debtor's principal residence are immune from such modification unless the final payment on that indebtedness is scheduled to come due before the final payment under the plan is to be paid.  *Cf.* 11 U.S.C. § 1322(c).

Again, there is one exception to Section 1322(b)(2)'s prohibition against modifying home mortgage loans and Debtors in fact took advantage of it at the outset of their case. As already discussed, Debtors were in substantial default with Cendant when they commenced their case.[15] It is likely, then, that Cendant would have foreclosed against their home had they not filed for Chapter 13 relief. Moreover, Debtors faced the prospect of foreclosure again upon the completion of their plan if they could not also compel Cendant to waive the prepetition defaults in connection with their plan. In other words, without an actual cure of these defaults, it was only the automatic stay that was keeping Cendant at bay and that stay could in no event continue beyond the plan's completion. *Cf.* 11 U.S.C. § 362(c)(2).

Fortunately for Debtors, Section 1322(b)(5) allowed them to obtain the additional relief they needed. It provides that a debtor through his plan may cure any default, including a default in payment on a home mortgage loan, notwithstanding Section 1322(b)(2). Debtors' plan, therefore, included a provision that not only provided for the Chapter 13 trustee to continue making the regular installments owing to Cendant as they came due but also to cure Debtors' existing defaults to Cendant through the repayment of the many installments they had previously missed.[16] As such, Debtors would have had peace of mind vis-a-vis the threat of foreclosure posed by their prepetition defaults had they performed the plan as originally confirmed.

---

[15]Debtors' original plan estimated the prepetition arrearage to be $6,100.00. That would have equated to roughly five or six monthly payments under the note.

[16]Cendant did not object to the confirmation of Debtors' plan. However, even if it had, its objection would have been limited to only the amount asserted by Debtors as the arrearage and the reasonableness of the period within which Debtors proposed to repay it. *Cf.* 11 U.S.C. § 1322(b)(5).

However, they did not and, as a consequence, Debtors are once again in substantial default on their home mortgage loan with Cendant.[17]  Debtors' amendment, then, is nothing more than a repeat of the tactic that had worked before.  That is, Debtors want to again compel Cendant to waive its right to foreclosure under the agreed upon mortgage, but this time the waiver is with respect to new, post-confirmation defaults.

There is a general consensus that Section 1322(b)(5) also extends to postpetition defaults. *See, e.g., Green Tree Acceptance, Inc. v. Bryant (In re Hoggle)*, 12 F.3d 1008 (11th Cir. 1994).  Like the case at hand, *Hoggle* involved the question of whether the debtor could cure a post-confirmation default in his mortgage payments through a plan modification.  The mortgagee, Green Tree, contended that he could not because Section 1322(b)(5) permitted only the cure of prepetition defaults.  The Eleventh Circuit disagreed, concluding instead that the subsection's reference to "any default" referenced postpetition defaults as well.

> Section 1322(b)(5) clearly states that a plan may provide for the curing of *any* default. Congress could have easily inserted the word prepetition to modify default but failed to do so. The omission is significant. The plain meaning of § 1322(b)(5) permits cure of any default whether occurring prior to the filing of the petition or subsequent to confirmation of the plan. Thus, § 1322(b)(5) would permit cure of postconfirmation defaults.

*Id.* at 1010 (emphasis in original) (footnote omitted).

---

[17]Debtors continued to have the same rights to cure payment defaults under the agreement itself as they had with their prepetition defaults. For instance, Debtors could under the agreement's own terms make up a late payment so long as it was paid before the next installment was due. However, it appears that Debtors' post-confirmation defaults to Cendant exceed what can be addressed under the terms of the agreement alone.

10

This court agrees with *Hoggle* that Section 1322(b)(5) does not make a distinction between pre- and postpetition defaults. Indeed, Section 1322(b)(5) would have little practical use otherwise, for a debtor will more often than not get behind on one or two payments immediately after the commencement of his case as he and the Chapter 13 trustee work out the details of how ongoing mortgage payments are to be made.

*Hoggle*'s observation that Section 1322(b)(5), standing alone, would permit the cure of even postconfirmation defaults is likewise correct. However, Section 1322(b)(2) is not the only Code section that must be considered in such circumstances, for a postconfirmation cure can only be accomplished if it also falls within the scope of the postconfirmation amendments permitted by Section 1329. The problem, then, with *Hoggle* is that it overlooks the separate question of whether the Section 1329 process can even be employed to take advantage of the cure that Section 1322(b)(5) would otherwise seem to permit.

There is no question that Debtors have the ability under Section 1329(a) to increase the payments the Chapter 13 trustee is to make to Cendant under their plan. And Cendant, in turn, could have agreed to accept those additional payments in exchange for its waiver of the Debtors' postconfirmation defaults. Indeed, Cendant might have subjected itself to an estoppel argument had it elected to remain silent and simply accept the payments under the amended plan.

However, Cendant has objected. Moreover, it objects because the amendment involved is not just an arrangement to increase the payments Cendant is to receive. What it also contemplates

11

is the elimination of Cendant's right under the mortgage it was granted to proceed with foreclosure because of these new defaults under the terms of the loan.[18] As *Nichols* itself observed:

> The Supreme Court has recognized, as did the common law, that the secured creditor has two types of rights: the *contractual* right to obtain repayment of its debt with a fair rate of return in the form of interest payments and the *property right* the creditor has in the collateral that secures the debt. These two types of rights together constitute the "bundle of rights" held by the secured creditor.

*Id.* at 854 (emphasis in original).

Cendant's complaint is that Debtors' attempt to modify this right in the amendment they are now proposing falls outside of the scope of the post-confirmation amendments that Section 1329(a) permits.

The Sixth Circuit has unequivocally stated that post-confirmation amendments of a plan will be allowed only if the proposed amendment falls within one of the categories specified in Section 1329(a). As a bankruptcy appellate panel for this circuit recently observed:

> [T]he Sixth Circuit Court of Appeals has addressed modifications under § 1329 on three separate occasions and in each instance has reiterated the necessity of only permitting modifications that strictly

---

[18]Neither the December 17, 2010 amendment that the parties have included in the stipulated record nor the other two post-confirmation amendments Debtors have recently filed actually address Debtors' desired cure of their post-confirmation defaults with Cendant. Moreover, Cendant has never formally objected to Debtors' proposed amendment because Debtors have never actually sought its approval. However, Debtors stated in their response to Cendant's lift of stay motion that the purpose of the amendment was to cure the post-petition arrearages owing to Cendant. Similarly, Cendant has focused upon the amendment as the most significant impediment to its motion. Therefore, the court has treated Cendant as having in fact objected to a proposed amendment by Debtors to include the cure of the post-confirmation defaults even though it has done so only indirectly and Debtors have not actually requested such a plan amendment. *See also* December 27, 2010 Scheduling Order (DN 89).

12

> fall within the parameters of § 1329, due in part to the binding effect
> of confirmation under § 1327.

*Storey v. Pees (In re Storey)*, 392 B.R. 266, 271 (B.A.P. 6th Cir. 2008).

*Nolan*,[19] *Adkins*,[20] and *Parmenter*[21] are the three Sixth Circuit decisions that *Storey* cites. At issue in *Nolan* was whether the debtor could reclassify a previously allowed secured claim as an unsecured claim through a post-confirmation amendment. The court concluded that she could not because of the strict limitations imposed by Section 1329(a) upon such amendments.

> Read with the benefit of proper term definitions, section 1329 clearly
> indicates that modifications after plan confirmation cannot alter a
> *claim* (a right to a remedy or payment of a certain total amount), but
> can extend or compress payments and reduce or increase the *amount*
> of the delivery of value planned as an eventual satisfaction for the
> creditor's claim.
>
>                           . . .
>
> Section 1329(a) only permits modification of the *amount* and *timing*
> of *payments*, not the total *amount* of the *claim*.

*Nolan*, 232 F.3d at 535 (emphasis in original) (footnotes and citation omitted).

As for *Parmenter*, it also held that "the changes permitted by the Code [Section 1329] concern modifications to the amount and timing of payments, not to the creation of a new obligation on the estate . . . ." 527 F.3d at 609.

---

[19]*Chrysler Fin. Corp. v. Nolan (In re Nolan)*, 232 F.3d 528 (6th Cir. 2000).

[20]*Ruskin v. DaimlerChrysler Servs. N. Am., L.L.C. (In re Adkins)*, 425 F.3d 296 (6th Cir. 2005).

[21]*Ford Motor Credit Co. v. Parmenter (In re Parmenter)*, 527 F.3d 606 (6th Cir. 2008).

And finally, in *Adkins*, the Sixth Circuit elaborated upon *Nolan* by emphasizing that a strict interpretation of Section 1329(a)'s scope is dictated not only by the plain language of that section but also by the need to bring finality to the confirmation process.

> *Nolan*'s holding was not based solely on the language of section 1329. As discussed above, *Nolan* relied heavily on the language of sections 1325 and 1327. DaimlerChrysler emphasizes that section 1327 provides that once a plan is confirmed, its provisions bind the debtor and each creditor. Indeed, confirmation of a plan has been described as "res judicata of all issues that could or should have been litigated at the confirmation hearing."

*Id.* at 302 (quoting from *In re Cameron*, 274 B.R. 457, 460 (Bank N.D. Tex. 2002).

*Adkins* then went on to say that:

> [W]e find that there exists no provision in the Code applicable to this case that would allow a reclassification of the deficiency given the "binding effect" of the confirmed plan under 11 U.S.C. § 1327.

*Id.* at 305.

Granted, Debtors here are not attempting to reclassify a claim. Nonetheless, they are asking for relief that clearly falls outside the plain language of Section1329(a). Therefore, this court is no more empowered to allow the post-confirmation amendment they desire than were the courts in *Nolan*, *Adkins*, and *Parmenter* inclined to permit the post-confirmation modifications desired in those cases. Simply put, Section 1329(a) must be limited to only the modifications that are specifically provided for under that section. Otherwise, the finality that Congress intended by making the original confirmation order binding upon both debtors and creditors alike would be seriously undermined. *Cf.* 11 U.S.C. § 1327(a).

Courts that have allowed post-confirmation amendments to cure home mortgage defaults tend to ignore altogether the limitations of Section 1329(a). They prefer instead the more accommodating

14

language of Section 1329(b)(1),[22] with its suggestion that the debtor's ability to provide in his original plan for the cure of a home mortgage loan default is equally available when the cure is sought as a post-confirmation modification. For example, in *In re McCollum*, one of the cases Debtors cite, the court said:

> In view of the rehabilitative purpose of chapter 13, it is the court's opinion that §§ 1329, 1322(b)(2) and (5) permit the court to approve the modification of a plan to take into account post-confirmation defaults in payment to a creditor secured only by the debtor's residence. The court finds that the modified plan dated May 5, 1987 complies with the provisions of § 1322 and § 1325 and should be approved.

76 B.R. 797, 801 (Bankr. D. Or. 1987).[23]

However, as tempting as this rationale may seem, the Sixth Circuit has made it quite clear that Section 1329(b)(1) cannot be relied upon as a substitute for Section 1329(a).

> A debtor cannot use section 1329(b)(1) to enlarge the modification permitted by section 1329(a), since section 1329(b)(1) does not apply unless the proposed modification first complies with section 1329(a)(1).

*Nolan*, 232 F.3d at 532 (citation omitted).[24]

In sum, Section 1329 permits only those modifications specifically set forth in subpart (a) and that subpart does not allow for the second modification of Cendant's mortgage rights that Debtors need.

---

[22]Section 1329(b)(1) provides that "[s]ections 1322(a), 1322(b), and 1323(c) . . . and the requirements of section1325(a) . . . apply to any modification under subsection (a) of this section."

[23]*See also In re Hoggle*, 12 F.3d at 1010; *In re Gadlen*, 110 B.R. 341, 342-43 (Bankr. W.D. Tenn. 1990); *In re Bellinger*, 179 B.R. 220, 223 (Bankr. D. Idaho 1995).

[24]*See also Adkins*, 425 F.3d at 300.

15

*Davis*[25] is another case relied upon by Debtors.  Like *Hoggle*, that case recognized that Section 1322(b)(5) permits a plan to cure both pre- and postpetition defaults on home mortgage loans.  However, *Davis* was able to avoid the much thornier issue of whether later defaults could be cured through a Section 1329(a) plan amendment by relying instead upon simply equity and the reasonableness of what the debtors were proposing.

> In the instant proceeding Mr. and Mrs. Davis propose to pay the full post confirmation arrearage well within the statutory term of the plan and maintain ongoing contractual payments.
>
> . . .
>
> Mr. and Mrs. Davis, as stated, only propose to cure an economic default. § 1322(b)(5). Their request is not unreasonable or inequitable under a totality of the particular facts and circumstances.

*Davis*, 110 B.R. at 836.

However, both the Supreme Court and the Sixth Circuit have held that bankruptcy courts may not use equity to justify an outcome that conflicts with what the Bankruptcy Code otherwise requires. For example, in *Norwest Bank Worthington v. Ahlers*,[26] the debtors were attempting to retain ownership of their farm through a Chapter 11 plan in spite of the absolute priority rule imposed by Section 1129(b).  The debtors argued, among other things, that the equities of their particular circumstances permitted overlooking Section 1129(b) and the impediments it posed to the debtors' reorganization.

The Court, though, did not agree.

---

[25]*In re Davis*, 110 B.R. 834 (Bankr. W.D. Tenn. 1989).

[26]485 U.S. 197, 108 S. Ct. 963 (1988).

16

> The short answer to these arguments is that whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code.
>
> . . .
>
> The Court of Appeals may well have believed that petitioners or other unsecured creditors would be better off if respondents' reorganization plan was confirmed. But that determination is for the creditors to make in the manner specified by the Code. 11 U.S.C. § 1126(c). . . . This was their prerogative under the Code, and courts applying the Code must effectuate their decision.

*Id.* at 206-07, 108 S. Ct. at 969.

*See also Childress v. Middleton Arms, L.P. (In re Middleton Arms, Ltd. P'ship)*, 934 F.2d 723, 725 (6th Cir. 1991) (bankruptcy courts "cannot use equitable principles to disregard unambiguous statutory language") (quoting from *Ray v. City Bank and Trust Co. (In re C-L Cartage Co., Inc.)*, 899 F.2d 1490, 1494 (6th Cir. 1990) and *Miller v. Penn. Higher Ed. Assistance Agency (In re Miller)*, 377 F.3d 616, 620-21 (6th Cir. 2004)).[27]

Therefore, while this court certainly acknowledges the Sixth Circuit's admonition in *Nichols* that the equities must first be weighed before cause is found to lift the stay, this court must also honor its obligation to subordinate those equities to what the Code otherwise dictates. Indeed, it is *Ahlers* itself that makes this point, for it too arose in the context of a motion for relief from stay. "Cause" under Section 362(d)(1) is vague for good reason. For example, should a home mortgage lender bring a motion for relief from the stay at the outset of a Chapter 13 case, it is appropriate for the court to consider whether the debtor proposes to cure his prepetition and even postpetition

---

[27]It is also likely that the *Davis* court would not have bypassed the limitations imposed by Section 1329(a) had it made its decision after *Nolan*, *Adkins*, and *Parmenter* given that the *Davis* court sits within the Sixth Circuit.

defaults through his yet to be confirmed plan. Or, as was the case in *Nichols*, there are times when the Code offers an opportunity to avoid the consequences of even a post-confirmation default to a secured creditor.

However, the Code also imposes restrictions upon the processes it otherwise allows and those restrictions must be honored no matter how much equity may cry out for a different outcome. In *Ahlers*, it was the absolute priority rule that stood in the debtors' way; in this instance, it is Section 1329(a)'s limitation on what more can be accomplished through further amendment once the debtor has had his original plan confirmed.

This is not to say that a debtor cannot use the amendment process to avoid foreclosure due to later defaults on his home mortgage loan. Debtors often have approved, without objection, plan amendments that increase payments to their mortgage lenders on account of post-confirmation defaults. From the court's perspective, such an amendment is nothing more than what it purports to be – a change in payment permitted under Section 1329(a)(1). If the debtor was prudent, he would have procured beforehand the mortgage lender's agreement to waive the defaults as a condition to that amendment. If not, the debtor can only hope that the creditor's failure to object, coupled with its silent acceptance of several payments in the increased amount, will serve to estop the creditor from later using the defaults as a basis for foreclosure.[28]

---

[28]Although not suggested by Debtors, another interpretation of their proposed amendment might be that the increase in payment was to prevent Cendant from foreclosing on its mortgage for only the remainder of their plan. However, this is a distinction without substance, for Debtors would still be using the bankruptcy process – to wit, the continued imposition of the automatic stay coupled with the increase in payments – to preclude what otherwise would be Cendant's rights under the home loan and mortgage to foreclose. *Nichols* certainly speaks of the equities that must be considered each time a creditor comes before the court seeking relief from the automatic stay for cause. However, as *Ahlers* teaches, equities must always yield to whatever limitations the Code itself imposes and the Code does not permit a debtor a second chance to force upon his mortgage

18

## CONCLUSION

The court recognizes that Debtors have fallen behind on their plan payments for reasons beyond their control and that, as a consequence, they are once again in arrears on their home loan with Cendant. The court also accepts for the sake of argument Debtors' contention that they can repay whatever is now in arrears over the remainder of their plan if only they are given the chance. However, the post-confirmation amendment process under Section 1329 does not permit Debtors a second chance to use Chapter 13 as a means to alter what otherwise are Cendant's rights under its agreement to foreclose on its mortgage. Therefore, cause exists under Section 362(d)(1) to lift the automatic stay so that Cendant may proceed with those rights.

The court will prepare a separate order consistent with this opinion.

7/14/11

Hon. Jeffrey R. Hughes
United States Bankruptcy Judge

Signed this 14th day of     July     , 2011,
at Grand Rapids, Michigan.

---

lender the waiver of a payment default. Moreover, it makes no difference whether the compelled waiver is to be permanent or only for the remaining life of the plan. In either instance, cause will exist for the stay to be lifted so that the mortgage lender may proceed with its rights under state law.

19